**SIGNED THIS: June 5, 2025**

_____

**Mary P. Gorman**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No.    24-71004 |
| BRETT L.A. LONG, | ) | |
| | ) | Chapter 13 |
| Debtor. | ) | |

## O P I N I O N

Before the Court after trial is a motion to annul the automatic stay or, alternatively, to dismiss the case filed by United Community Bank. Because the Debtor failed to give timely notice of the filing of his bankruptcy case to United Community Bank so that a foreclosure sale of his residence that occurred in violation of the automatic stay could have been cancelled, the motion will be granted in part. The automatic stay will be annulled.

## I.      Factual and Procedural Background

The Debtor, Brett L.A. Long, filed his voluntary Chapter 13 petition and related schedules and statements after the close of business on Friday, December 20, 2024. He was represented in the filing by Attorney Joseph Pappas, who continues to represent him. On Schedule A/B, the Debtor disclosed his sole ownership of residential real estate located at 1927 S. College Street, Springfield, Illinois. On Schedule D, the Debtor identified the holder of a claim secured by the College Street property as "UNITED COMMUNITY BANK OF P" with a mailing address of "PO Box 686" in Pawnee, Illinois. The creditor was listed on the mailing matrix by the same name and address. On his Statement of Financial Affairs, the Debtor disclosed a foreclosure action pending against him brought by United Community Bank ("UCB") in the Circuit Court of Sangamon County, Illinois, under case number "23FC000175."

The standard Notice of Chapter 13 Bankruptcy Case was issued by the Bankruptcy Clerk's Office on Monday, December 23, 2024. A Certificate of Notice was docketed on December 25, 2024, by the Bankruptcy Noticing Center showing electronic notice on December 23, 2024, for persons enrolled to receive notices electronically and notice by mail on December 25, 2024, for all others, including "UNITED COMMUNITY BANK OF P, PO Box 686, Pawnee, IL 62558-0686."

On January 22, 2025, the Debtor's attorney filed a claim on behalf of "UNITED COMMUNITY BANK OF P" in the amount of $62,965, notice of which was mailed by the Clerk on January 24, 2025, to PO Box 686 in Pawnee,

Illinois. On February 6, 2025, the claim was amended by Attorney Timothy Rigby, counsel for UCB, providing his business address in Springfield, Illinois, for purposes of future notice and service on UCB.[1]

On February 13, 2025, the Debtor filed an adversary complaint against UCB and two other parties seeking both a declaratory judgment that the post-petition foreclosure sale of the Debtor's College Street property was void *ab initio* and an order restraining enforcement of the sale because it was conducted in violation of the automatic stay. The executed summons shows service on UCB by mail sent to Attorney Rigby at the address he provided in the amended proof of claim. UCB responded by promptly filing a motion to dismiss the adversary proceeding and a motion for relief from the automatic stay or dismissal of the bankruptcy case.

After several docketing issues and deficiencies, UCB filed the Amended Motion to Annul the Automatic Stay Pursuant to 11 U.S.C. §362(d)(1) or in the Alternative to Dismiss Case Pursuant to 11 U.S.C. §1307(c) that is now before the Court along with a memorandum in support of the motion. The Amended Motion seeks annulment of the automatic stay granting UCB retroactive relief based on the Debtor's bad faith and failure to give timely notice of his bankruptcy filing to UCB resulting in the sale of the College Street property in violation of the automatic stay. Alternatively, the Amended Motion seeks dismissal of the bankruptcy case "for cause" in that the petition was filed in

---

[1] The Debtor filed an objection to the amended claim, but the objection was not processed due to an uncured deficiency. An order was later entered denying the Debtor's objection as moot due to the filing of a subsequent amended claim by UCB.

bad faith. Both the motion to dismiss in the adversary proceeding and the Amended Motion to Annul Stay in the bankruptcy case were initially set for hearing on March 25, 2025.

Prior to the March 25 hearing, the Debtor filed an objection to the Amended Motion to Annul Stay asserting that the Debtor and his attorney reasonably relied on the Debtor's Equifax credit report to provide an accurate address for UCB for purposes of bankruptcy noticing and that UCB had a duty to maintain accurate information with credit reporting agencies. The March 25 hearing was held as scheduled during which the Amended Motion to Annul Stay was scheduled for trial. The motion to dismiss in the adversary proceeding was continued pending hearing on the Amended Motion to Annul Stay.

In accordance with the Court's pretrial order requiring exhibits to be docketed seven days before trial, UCB docketed its exhibits and a list of witnesses on May 15 for the scheduled May 22 trial. On May 20—two days before trial—Attorney Pappas filed the Debtor's lists of intended exhibits and witnesses along with an apology for his failure to comply with the pretrial order and an attempt to justify his failure with an explanation that he was on a family vacation from May 14 through May 19.

The May 22 trial was held as scheduled. The Court first addressed the Debtor's failure to comply with the pretrial order and said that it was inclined to bar the use of the exhibits to the extent the same exhibits were not already docketed by UCB or part of the case record absent compelling reasons for allowing them. Attorney Pappas said he understood but made no attempt to

defend his failure to comply with the Court's pretrial order. The trial proceeded with UCB's presentation of evidence. UCB's case consisted of two witnesses: an employee representative of UCB and a representative of the buyers from the foreclosure sale of the College Street property.

Jeff Stolleis, a senior vice president at UCB, was the first witness to testify. He said that he has worked in the banking industry for 34 years, beginning as a teller with Marine Bank and working at other institutions before joining UCB 11 years ago. After three years with UCB as vice president, he was promoted to senior vice president of loss mitigation and continues to hold that title. Mr. Stolleis said he became familiar with the Debtor's file when his account became delinquent. He explained that, in his capacity as senior vice president, he oversees the handling of delinquent accounts, which can include work out plans, repossessions, and foreclosures. In terms of foreclosure proceedings, Mr. Stolleis said that he decides when to pursue relief, makes appropriate referrals to outside counsel, and stays involved throughout the process.

Mr. Stolleis identified a promissory note dated July 23, 2021, by which UCB loaned $60,000 to the Debtor for the purchase of the College Street property. The Debtor executed the note on that date as well as a mortgage on the College Street property in favor of UCB to secure the loan. The Debtor subsequently defaulted on the note, and his file was referred to Mr. Stolleis. Mr. Stolleis identified a demand letter dated May 1, 2023, and addressed to the Debtor at the College Street address. The letter gave notice that the Debtor's

account was past due and that failure to bring the account current within 30
days would result in acceleration of the note and possible foreclosure. A second
letter was sent May 31, 2023, which outlined the past due amounts and
warned that the account would be referred for foreclosure if not brought
current within 30 days. The May 31 letter also invited the Debtor to contact
UCB to explore ways to remedy the situation, including modification of the
loan. Mr. Stolleis said that UCB regularly maintains a record of payments and
charges for each loan in its portfolio, and, according to the Debtor's account
records, UCB last received a payment on the note on July 11, 2023, which was
applied to past due amounts but was not enough to bring the loan current.
Among the records UCB regularly maintains for customer accounts, Mr.
Stolleis referred to a document he described as a "workflow history" that tracks
the history of communications and documents sent between UCB and its
customers for each account. He identified the "workflow history" for the
Debtor's account and said that it shows UCB sent its standard packet with
information and forms for requesting a loan modification to the Debtor in
December 2022, April 2023, and May 2023. Although the Debtor expressed
interest in a modification, he never submitted the completed forms to move the
process forward.

Mr. Stolleis said he later retained Attorney Rigby's firm to pursue
foreclosure on behalf of UCB. On October 3, 2023, a complaint for foreclosure
was filed in Sangamon County, Illinois, which Mr. Stolleis said he reviewed and
verified prior to its filing. According to the complaint, the total amount due at

the time was $59,705.88. Mr. Stolleis said Attorney Rigby's law firm provided him with periodic reports on foreclosure cases that included case events and status updates on pending matters. He identified a report provided to UCB after the sale of the College Street property in the Debtor's foreclosure case, adding that information pertaining to other foreclosure cases had been redacted so that only information on the Debtor's case was shown. Referring to the report, Mr. Stolleis said the Debtor was served with the foreclosure complaint on October 16, 2023. A motion for judgment was filed January 16, 2024, along with an affidavit for judgment. Hearing on the request for judgment was continued at the Debtor's request; he wanted time to respond to the complaint. The Debtor, through counsel, filed an answer to the complaint on February 22, 2024, denying the validity of and his liability on the debt, and thereafter propounded discovery requests on UCB.

According to Mr. Stolleis, he spent multiple hours over several days gathering information responsive to the requests that culminated in the production of roughly 800 pages. He guessed he had been involved in around 200 foreclosures in his career and said that the Debtor's case is the only one in which he recalled receiving such extensive discovery requests. He was not aware that the Debtor in fact used any of the discovery in the proceeding. The discovery demands did, however, slow the case's progress. Mr. Stolleis said that the Debtor's attorney in the foreclosure action also informed UCB that the Debtor was interested in working things out through a loan modification. Mr. Stolleis explained that, per its usual practice, UCB paused prosecution of the

foreclosure when it was informed of the request for loan modification and began the loan modification process, which included sending the Debtor—for a fourth time—the standard packet that he was to complete and submit to UCB.

When nothing came of the loan modification, the hearing for judgment on foreclosure was reset for September 25, 2024. In anticipation of the hearing, UCB filed an amended affidavit as to amounts then due and owing that it calculated at $79,662.35, including attorneys' fees and costs and escrow deficiencies accrued since the foreclosure complaint was filed. Judgment of foreclosure was entered after hearing on September 25, 2024, and a sale of the College Street property was scheduled for January 7, 2025. In anticipation of the sale, UCB filed an affidavit of confirmation that included post-judgment interest, attorneys' fees, and sale costs, for a total amount of $84,780.18. The January 7 sale was completed as scheduled with a winning bid from third-party buyers. A report of sale was filed, and an order confirming the sale was entered after hearing on January 15, 2025. The order confirming sale reflected a sale price of $59,000, which Mr. Stolleis said was paid to UCB and applied against the judgment amount, leaving a deficiency of $25,780.18. A sheriff's deed was prepared by the buyers and recorded on January 16, 2025.

Mr. Stolleis said UCB was not aware of the Debtor's bankruptcy filing until after the foreclosure sale was confirmed and the sheriff's deed was recorded. He said that, on a Friday afternoon in late January 2025, a bank employee emailed him a copy of a notice for the Debtor to appear at the first meeting of creditors that the Chapter 13 trustee had sent to all parties on the

mailing matrix. He said he immediately contacted Attorney Rigby. On cross-examination, Mr. Stolleis could not identify who forwarded the notice to him or explain how that person received it. He agreed that the certificate of service attached to the bankruptcy notice showed that it was sent to the incorrect address for UCB provided by the Debtor.

According to Mr. Stolleis, UCB has a company-wide policy of forwarding all bankruptcy notices received at any of its 45 branches to him at his office in Auburn, Illinois. It is also not unusual for a customer or their attorney to inform him or Attorney Rigby directly when a bankruptcy proceeding is filed while a foreclosure action is pending. At no point prior to receiving the notice in late January, however, had any employee, the Debtor or his attorney, or Attorney Rigby informed him of the Debtor's pending bankruptcy. Once informed of a bankruptcy filing, Mr. Stolleis said UCB stops all collection efforts and proceedings; in the Debtor's case, the foreclosure sale would not have occurred, and the sale would not have been confirmed had UCB received timely notice of the bankruptcy filing.

The mortgage documents list two addresses for UCB: its Springfield branch located at 617 Bruns Lane and its main branch location at 301 North Main Street in Chatham, Illinois. Mr. Stolleis acknowledged that UCB maintains a branch location in Pawnee, Illinois, but he was not aware that the Debtor had any connection to that branch. He said that the PO Box 686 listed on the Debtor's bankruptcy schedules and mailing matrix did not belong to UCB, and he did not know why the credit bureau would have UCB's address

listed as PO Box 686 in Pawnee or how it would have obtained that address. Mr. Stolleis said that all 45 branch locations and their addresses are listed on UCB's website. He reiterated that, had notice of bankruptcy been sent to any of the 45 locations at the addresses listed on the website, he would have been notified without delay.

Mr. Stolleis identified the proof of claim filed by the Debtor, through Attorney Pappas, on behalf of "UNITED COMMUNITY BANK OF P" on January 22, 2025.[2] He testified that neither he nor anyone associated with UCB had any part in the preparation or approval of the proof of claim. He noted that the amount of the claim was significantly lower than the amounts actually owed to UCB. Mr. Stolleis testified that UCB filed an amended proof of claim on February 6, 2025, and then another on March 6, 2025. He said that he provided the information to Attorney Rigby who in turn filed the amended claims on behalf of UCB. The second amended claim was filed to account for additional legal fees associated with the foreclosure as of December 20, 2024. The second amended proof of claim asserted a secured debt of $90,009.99. Mr. Stolleis said UCB has at all times been and continues to be the owner of the note upon which its claim is based.

Mr. Stolleis explained that UCB has an arrangement with Attorney Rigby's firm for the handling of most foreclosure cases for a flat fee of $3350 based on Fannie Mae guidelines. In cases where significantly more work is required, Attorney Rigby's firm is compensated on an hourly-rate basis; the

---

[2] The proof of claim itself states that it was executed on January 22, 2024, but it was in fact filed on January 22, 2025.

Debtor's foreclosure was one of those cases. Mr. Stolleis identified a group of invoices from Attorney Rigby's firm relating to fees and costs associated with the Debtor's foreclosure case. Invoices for October and December 2024 show fees and costs in excess of $12,000, and an invoice for February 2025 shows fees and costs of another $4100 mostly incurred after the bankruptcy petition was filed. He said that, other than the costs of publishing notice of the sale, the fees and costs covered in the February 2025 invoice would not have been incurred had UCB known of the bankruptcy filing. Likewise, Mr. Stolleis said that UCB could have largely avoided incurring additional fees associated with the Debtor's bankruptcy had it been given notice of the filing such that it could have stopped the foreclosure proceeding prior to sale.

On cross-examination, Mr. Stolleis was asked whether UCB has a policy of not accepting payments after demand is made on a delinquent account. He said that, technically, when a demand is made it is for the full balance of the delinquent amount, but partial payments are generally accepted and applied to the outstanding amounts due. As to the second amended proof of claim, Mr. Stolleis agreed that the $30,496.84 listed as the "amount necessary to cure any default as of the date of the petition" included all fees and costs through February 10, 2025. Mr. Stolleis acknowledged seeing the Debtor's first amended chapter 13 plan filed in the bankruptcy and that it provided for payment of UCB's second amended claim, including the arrearages.

UCB next called David Litman as a witness. Mr. Litman identified himself as the manager of Champaign Investment LLC, a company owned by his

parents that buys and flips real estate for profit. He said he partners with another company, Up To Date Rentals LLC, in flipping properties in Sangamon County. He identified Eric Anderson as the member and manager of Up To Date Rentals. Mr. Litman said he typically funds the partnership projects, Mr. Anderson does the work, and they split the profits. Champaign Investment and Up To Date Rentals together purchased the College Street property for $59,000 at the sheriff's sale conducted January 7, 2025. He said he was not present at the sale; Mr. Anderson attended and placed the winning bid on the companies' behalf.

Mr. Litman identified the state court order confirming the sale on January 15, 2025. He noted Champaign Investment and Up To Date Rentals named as the purchasers in the order that further directed the sheriff to execute a deed in favor of the companies. Mr. Littman said he prepared the sheriff's deed executed on January 16, 2025, after which Mr. Anderson paid a fee and recorded the deed with the county. In addition to the purchase price and recording fee, Mr. Litman said that he had since incurred approximately $1650 in interest charges on the line of credit he used to purchase the property, monthly insurance premiums of $65, and a nonrefundable eviction fee paid to the sheriff even though the Debtor was never evicted. Mr. Litman estimated the additional expenses incurred after the sale to total $2147 so far. He said the plan was to fix up the property and sell it within two months of purchase, hopefully netting $30,000 in profit for the partnership. He said the delay caused by the Debtor's bankruptcy filing has cut into their expected

profits with the additional costs and shrinking pool of buyers in a changed market.

On cross examination, Mr. Litman was asked about selling the property back to the Debtor on contract. He said he had not considered that but would likely not be interested in doing so. UCB rested its case following the testimony of Mr. Litman and the admission of its exhibits.

The Debtor testified as the sole witness in his defense. He acknowledged signing the note and mortgage in favor of UCB for the purchase of the College Street property in July 2021. At the time, he worked for a pest control company, but his employment with that company ended in September 2022. The Debtor remained unemployed until the following summer, when he was hired by Leafguard. He has been employed with Leafguard since June 2023. He continues to reside in the College Street property along with his fiancé, her 3 children, and her mother.

The Debtor said he did not recall seeing any of the demand letters sent to him by UCB. He testified to making a July 11, 2023, payment on the UCB loan after he began working at Leafguard. He said he tried to make other payments without success. For one such payment, he said he made a payment of $1000 through UCB's online portal that showed it was being submitted but was never applied to his account. He said he was later told that the payment did not go through due to an error. On another occasion he tried to make a payment, the Debtor said he was told he could not make regular mortgage payments and that the arrearage needed to be paid in full.

On cross-examination, the Debtor was asked who from UCB told him not to make regular mortgage payments. He did not know her name but identified the person as "the woman who took over after Jeff." The Debtor also reviewed notes from UCB's workflow history representing that he requested a loss mitigation packet on December 5, 2023. He agreed that he made such request, that he received the packet, and that he completed and submitted it to UCB by mail on two occasions. He also acknowledged notes from November and October of that year reflecting phone calls he made to UCB expressing that he was trying to catch up but unable to make payments. He agreed that those notes accurately reflected the situation at the time and that none of them mentioned him being instructed not to make payments.

Presented with one of the demand letters, the Debtor again said he did not recall receiving or seeing it at the time. He agreed that, other than the July 11, 2023, payment, he did not make any payments on the loan after beginning work in June 2023. The Debtor stated that his pending chapter 13 plan provides for full payment of the UCB delinquency as well as the ongoing monthly payments. He testified that he is current in his payments to the Chapter 13 trustee.

At the close of all evidence, the attorneys presented arguments and citation to authorities. The matter is ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Matters involving modification of the automatic stay are core proceedings. 28 U.S.C. §157(b)(2)(G). The issues before the Court arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III.    Legal Analysis

### A. Annulment of the Automatic Stay

The filing of a bankruptcy petition generally stays the collection, commencement or continuation of judicial proceedings, and enforcement of judgments against the debtor. 11 U.S.C. §362(a)(1), (2). The stay is automatic, and actions taken in violation of the stay are generally void. *See Middle Tenn. News Co. v. Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1082 (7th Cir. 2001) (citations omitted). Without question, the continuation of UCB's foreclosure proceeding and the resulting sheriff's sale of the College Street property after the Debtor's bankruptcy petition was filed violated the automatic stay and, under ordinary circumstances, would be void. UCB, however, asks that the automatic stay be annulled to grant retroactive relief from the stay to UCB.

Bankruptcy courts have the power to annul the stay for cause under §362(d). *See In re Brittwood Creek, LLC*, 450 B.R. 769, 775 (N.D. Ill. 2011) (citations omitted). To determine whether cause exists to retroactively annul the automatic stay in a case, courts utilize a variety of factors. *See In re Wapotish*, 2009 WL 1916965, at *1-2 (Bankr. N.D. Ill. July 2, 2009).[3] One line of cases in the Seventh Circuit has focused on "whether the creditor who violated the stay did so willfully and whether the movant would be unfairly prejudiced by the enforcement of the stay" when considering annulment in order to validate a state court foreclosure proceeding. *Brittwood Creek*, 450 B.R. at 775 (quoting *Will v. Ford Motor Credit Co. (In re Will)*, 303 B.R. 357, 368 (Bankr. N.D. Ill. 2003)).

Here, the unrebutted testimony of Jeff Stolleis established that UCB did not willfully violate the stay. The Debtor listed UCB as "UNITED COMMUNITY BANK OF P" at a PO Box address in Pawnee, Illinois, not associated with UCB. Although UCB maintains a branch in Pawnee, Illinois, neither the Debtor nor the transaction at issue here had any connection to it. Without question, UCB

---

[3] In *Wapotish*, the court compiled the following non-exhaustive list of factors used by courts: "(1) whether creditor had actual or constructive knowledge of bankruptcy filing and, therefore, of automatic stay; (2) whether debtor acted in bad faith; (3) whether there is equity in the property of the estate; (4) whether property is necessary for an effective reorganization; (5) whether grounds for relief from stay existed, such that a motion for stay relief, if filed, would likely have been granted prior to the automatic stay violation; (6) whether failure to grant retroactive relief will cause unnecessary expense to creditor; (7) whether creditor has detrimentally changed its position on the basis of the action taken; (8) whether creditor took some affirmative action post-petition to bring about violation of stay; (9) whether creditor promptly seeks retroactive lifting of stay and approval of action taken; (10) whether issues in case involve only state law, so that expertise of bankruptcy court is unnecessary; (11) whether modifying stay will promote judicial economy and whether there will be greater interference with bankruptcy case if stay is not lifted because matters will have to be litigated in bankruptcy court; (12) whether estate can be protected properly by a requirement that creditors seek enforcement of any judgment through bankruptcy court; (13) number of bankruptcy filings by debtor; (14) extent of any prejudice, including to bona fide purchaser; (15) debtor's compliance with the Bankruptcy Code; (16) how quickly creditor moved for annulment; and (17) how quickly debtor moved to set sale aside." *Wapotish*, 2009 WL 1916965, at *2 (citations omitted).

did not receive notice when the Debtor filed his bankruptcy petition. Neither the Debtor nor Attorney Pappas informed UCB, Attorney Rigby, or the state court overseeing the foreclosure proceeding of the fact that a bankruptcy case had been filed despite the sale of the College Street property having been scheduled and publicly noticed prior to the bankruptcy.[4] Neither the Debtor nor Attorney Pappas made any attempt to stop the foreclosure sale, and they allowed the sale to later be confirmed and a sheriff's deed to be executed in favor of the buyer. It was not until after the sale was conducted and confirmed, and a deed transferring the property to the buyers was recorded that UCB learned of the bankruptcy filing. And when UCB finally did learn of the bankruptcy case, Mr. Stolleis immediately contacted Attorney Rigby who, in turn, promptly took action to address the problem by seeking to annul the stay.

Attorney Pappas said he listed UCB at an address he picked up from the Debtor's Equifax credit report, contending that he reasonably relied on the accuracy of the report. He also tried to shift the blame for his listing of an incorrect address to UCB, arguing that the bank had a duty to maintain accurate and up-to-date information with credit bureaus. But Attorney Pappas supplied no authority for his position, and the Court is not persuaded by the

---

[4] In closing arguments, Attorney Pappas said that it was his regular practice to reach out directly to creditors and their counsel when a case is filed shortly before a foreclosure sale and with the purpose of stopping the sale. He mentioned several personal reasons why he failed to follow the practice in this case but none of them justified the failure under the circumstances here. His failure to provide any direct notice to UCB or Attorney Rigby is particularly problematic because he had more than two weeks between the case filing and the scheduled sale to do so.

argument.[5] As the petitioner in bankruptcy, the Debtor was responsible for properly identifying his creditors so that those creditors received notice of the bankruptcy case. That task admittedly can be more difficult for some creditors than others. But for institutional creditors like UCB, the information is generally publicly available. And to the extent there is confusion about where notices should be sent, the bankruptcy forms include a section for debtors to provide additional names and addresses where notice should be sent for debts already listed. Even with the mistake in UCB's address, had Attorney Rigby been scheduled as an additional notice recipient, it is likely that the sale would have been cancelled. Unfortunately, the Debtor and Attorney Pappas chose a third-party source for information about UCB and made no apparent effort to verify the information before filing the petition. It would be unfair to penalize UCB for the Debtor's lack of diligence.

As UCB pointed out, its website lists the addresses of all 45 of its branches, and a bankruptcy notice received at any one of those listed addresses would be immediately forwarded to Mr. Stolleis for appropriate handling. Further, Attorney Rigby's contact information was readily available from filings in the foreclosure proceeding. Add the fact that the foreclosure and looming sheriff's sale appear to be the primary reasons for filing the

---

[5] The Court finds no authority for debtors' counsel to rely on credit reports to complete bankruptcy schedules in lieu of having their debtor clients provide information about their own debts. Using the credit reports as a backup to find debts that debtors may have overlooked may be a good practice. But simply uploading credit report information without doublechecking it is a dangerous and unreliable practice which can lead to problems as evidenced by the results here. There is no presumption that the information contained in credit reports regarding creditors' names or addresses is accurate or can be relied on to the exclusion of doublechecking the information.

bankruptcy petition, the failure to take basic steps to stop the foreclosure and prevent the sale is perplexing.

As a result of the Debtor's failure to notify UCB of his bankruptcy filing, UCB unnecessarily incurred significant fees and costs in relation to the foreclosure sale and in seeking remedial relief in the bankruptcy case. Forcing UCB to eat those fees and costs and unwind the post-petition events in the foreclosure proceeding for an unknowing, non-willful stay violation that could have been avoided with proper notice, a simple phone call, or a letter from the Debtor or his attorney to UCB or its attorney would unfairly prejudice UCB.

Attorney Pappas highlighted the provisions of the Debtor's pending Chapter 13 plan providing for full payment of the arrearage asserted in UCB's second amended claim, but that does little to diminish the prejudice to UCB if the stay is not annulled. If what happened in the foreclosure case and the resulting sale are void, then UCB will undoubtedly incur even more fees and costs to vacate the sale and otherwise unwind what occurred in violation of the stay. The Debtor's pending plan does not contemplate payment of those additional expenses, and the Court heard no evidence of any proposal for the Debtor to pay them. In any event, it is far from clear that the Debtor will be able to complete any Chapter 13 plan. The Debtor's first amended plan provides for monthly payments to the trustee of $1441.07, from which ongoing monthly mortgage payments to UCB and the arrearage are to be paid. The Debtor says he is current in his plan payments. The Debtor did not directly testify to his ability to make those payments going forward, but he admitted

that he struggled to make regular mortgage payments even when employed and that the last mortgage payment he made was in July 2023 despite his employment with Leafguard since June 2023.

There is also the prejudice to the buyers of the College Street property to consider. Champaign Investment and Up To Date Rentals paid $59,000 for the property. Presumably, UCB would return those funds if the sale were vacated. But Mr. Litman testified that he and his partner have incurred additional expenses in connection with the sale and the fallout surrounding the Debtor's bankruptcy. In closing arguments, Attorney Pappas acknowledged some prejudice to the purchasers of the property but suggested that such prejudice should be ignored because, citing this Court's *Grason* decision, a third-party purchaser who was not a creditor or party in interest when the case was filed and whose interest in estate property was acquired post-petition lacks standing to seek an annulment of the stay. *See In re Grason*, 486 B.R. 448, 459-61 (Bankr. C.D. Ill. 2013). But whether the third-party purchasers here have standing to seek an annulment of the stay is not the question before the Court and has no bearing on whether they would be prejudiced if the sheriff's sale is void. Unlike in *Grason*, the request to annul the stay here was brought by the real party in interest with standing, UCB. And among the factors to consider in evaluating a request by a party in interest to annul the stay is the "extent of any prejudice, including to [a] bona fide purchaser." *Wapotish*, 2009 WL 1916965, at *2; *see also Brittwood Creek*, 450 B.R. at 776 (prejudice to independent third-party purchaser "further counsels against an order voiding

the foreclosure sale"). The buyers of the College Street property have already been prejudiced by the delay caused by the Debtor's failure to provide notice of his bankruptcy to UCB; not annulling the stay and voiding the sale would cause further prejudice.

Several factors weigh in favor of annulling the automatic stay to validate the post-petition events that transpired in the foreclosure case. As discussed, UCB did not have actual or constructive knowledge of the bankruptcy case, and its violations of the stay were therefore non-willful. And not annulling the stay will cause prejudice and unnecessary expense to UCB as well as the buyers of the College Street property. The Debtor, on the other hand, was in the best position to prevent the sale of the College Street property, which UCB sent notice of well before the Debtor filed his bankruptcy and which was held as scheduled well after the bankruptcy filing. Even having failed to prevent the sale from occurring, the Debtor could have objected or moved to set aside the sale before it was confirmed a week later and the sheriff's deed was recorded and executed. But the Debtor did nothing, and the Court finds that the balance of the equities between the parties favors UCB. *See Brittwood Creek*, 450 B.R. at 776; *see also Matthews v. Rosene*, 739 F.2d 249, 251 (7th Cir. 1984) (interpreting statutory predecessor to §362 and annulling the stay in accordance with equitable principles). The automatic stay will therefore be annulled.

## B. Bad Faith and the Alternative Request to Dismiss Case

In asking the Court to annul the stay for cause, UCB contends that the Debtor acted in bad faith. Similarly, UCB contends that there is cause for dismissal under §1307(c) because the Debtor filed his bankruptcy petition in bad faith. Although widely recognized as a "valid reason to [modify] a stay or dismiss a petition, the concept of 'bad faith' (or lack of good faith) has resisted easy definition." *In re Grieshop*, 63 B.R. 657, 662 (N.D. Ind. 1986); *see also In re Love*, 957 F.2d 1350, 1355 (7th Cir. 1992). And rather than precisely define good or bad faith, the Seventh Circuit has left the determination to the discretion of bankruptcy courts, guided by the totality of the circumstances and a focus on fundamental fairness. *Love*, 957 F.2d at 1355-57 (citations omitted). As a result, courts look to a variety of factors for evaluating bad faith, any one of which may be persuasive and none of which are determinative. *Id.* at 1357; *In re Briggs*, 2012 WL 3780542, at *3 (Bankr. N.D. Ill. Aug. 31, 2012). In general, the factors used by courts look to the circumstances of the filing and the debtor's pre- and post-petition conduct, including any relevant history the debtor may have in bankruptcy court and dealing with a particular creditor. *Id.*

By all appearances, the Debtor's Chapter 13 petition was filed to save his home and stave off UCB. The College Street property was the Debtor's main asset, which served as security for his most significant debt. He filed his petition more than a year after UCB commenced a state court foreclosure action and just weeks before the College Street property was scheduled to be

sold. UCB presented evidence of the Debtor's delay tactics in the foreclosure proceeding, which included denying the existence and validity of the loan debt, propounding voluminous discovery requests on UCB for no apparent purpose, and requesting loan modification applications from UCB on which he never followed through. As a result of the Debtor's actions, the foreclosure process took twice as long as it normally would and UCB incurred significantly more fees and costs than it otherwise would have. Not long after the bankruptcy petition was filed—and the property had been sold through the foreclosure proceeding—the Debtor filed a proof of claim on behalf of UCB that understated the amount of the bank's debt but, like the filing of his bankruptcy petition, failed to give UCB notice of his actions.

Even so, the Debtor does not have a history before this Court and that this case was probably filed to thwart the foreclosure process is neither unusual nor indicative of bad faith *per se.* And while his failure to give a valid address and therefore notice of the bankruptcy to UCB resulted in a significant increase in the debt owed, no evidence was presented to suggest that the failure was intentional or malevolent. UCB characterizes the failure to give notice as a deception tactic employed by the Debtor, but to what end? Proper notice to UCB would have been the most effective way of staving off the sale of the College Street property; the Debtor instead allowed the sale to go forward and thereby frustrated his own prospects of keeping the property. Likewise, the understated proof of claim that the Debtor was quick to file on behalf of UCB

certainly invites suspicion;[6] but the Debtor did not object to the latest amendment to the proof of claim filed by UCB and his first amended plan proposes payment of the arrearage as stated in the second amended proof of claim. In addition, it appears the Debtor, thus far, has kept current in his plan payments to the trustee.

UCB is right to be frustrated and annoyed with the Debtor. He has been living in the College Street property without payment for the last two years. He caused unnecessary expense to UCB and the buyers of the property and engaged in delay tactics before and during the foreclosure process. But, as *Love* explains, egregious prepetition conduct does not give rise to a presumption that a debtor filed bankruptcy in bad faith. *Love*, 957 F.2d at 1355. And the Debtor's conduct as it relates to his bankruptcy filing, while not a paradigm for success and in some respects inexcusable, has thus far not proven to be tantamount to the egregious behavior described in *Love* or an otherwise "abuse of the provisions, purpose, or spirit" of Chapter 13 and the Bankruptcy Code. *Id.* at 1357-58. To be sure, the Court did not find the Debtor to be a credible witness and where the case goes from here remains to be seen. It suffices, for now, to annul the automatic stay as to UCB and the College Street property, thereby validating the sale and other events in the foreclosure proceeding. If the Debtor can put forth a confirmable plan and obtain a discharge after completion, it will come with substantial repayment of his remaining debts and

---

[6] Fed. R. Bankr. P. 3004(a) allows a debtor to file a claim for a creditor who fails to file their own claim. A debtor may file that claim within 30 days after the creditor's time to file has expired. Not only was the claim filed by the Debtor for UCB inaccurate, it was also filed out of time. UCB's deadline to file a claim had not run when the Debtor jumped in and filed for UCB. Attorney Pappas provided no explanation for the out-of-time filing.

ultimately lead to a fair result under the circumstances. The alternative request for dismissal will therefore be denied.

## IV.   Conclusion

The result here is unfortunate and certainly disappointing for the Debtor. But the Debtor and his attorney made multiple mistakes which compel the result. The case was filed to stop a foreclosure sale, but the address of the creditor conducting the sale was wrong on the schedules and mailing matrix, the attorney representing the creditor was not listed, and no direct notice by phone, fax, or email was set to the creditor or its attorney. These errors were compounded because neither the Debtor nor his attorney checked the state court docket to verify that the sale had been cancelled and thereby allowed the confirmation of the sale and the issuance of the sheriff's deed to go forward. Case law requires a balancing of the equities in considering whether to annul a stay. Here, without question, the equities all run in favor of UCB. The stay must be annulled, and an order granting that relief to UCB will be entered.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###